

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

F.#2003R00092　　　　　　　　　　　　*271 Cadman Plaza East*
MLM:DSS　　　　　　　　　　　　　　*Brooklyn, New York  11201*

April 2, 2008

By Hand and ECF

The Honorable Sterling Johnson, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

　　　　Re:　United States v. Laura Wang-Woodford
　　　　　　　Criminal Docket No. 03-070 (SJ)

Dear Judge Johnson:

　　　　The government submits this letter in response to the defendant's application, dated April 1, 2008, seeking to revoke the permanent order of detention entered by Magistrate Judge Viktor Pohorelsky on February 1, 2008.  The defendant, who is scheduled to appear before the Court for a status conference tomorrow, is charged in a twenty count indictment with, inter alia, exporting commercial aircraft parts to Iran in violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq., and exporting military aircraft parts to Singapore in violation of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778.

　　　　In support of her application for release, the defendant asserts that she does not pose a significant risk of flight and that discovery produced by the government thus far reveals that the proof of the defendant's guilt is weak. However, these arguments are predicated on factual assertions that are demonstrably incorrect.  Indeed, there exists overwhelming proof of the defendant's guilt.  In addition, the defendant has strong ties outside of the United States and substantial assets overseas.  Finally, the defendant was arrested in possession of weapons catalogues from a Chinese corporation that has been specifically designated a Weapons of Mass Destruction proliferator by the United States Treasury Department.  Therefore, the Court should uphold Judge Pohorelsky's determination and deny the defendant's application.

I.  Indictment and Arrest

On January 15, 2003, a grand jury returned a twenty count indictment against the defendant and her husband, Brian Woodford.  The indictment charges that, between January 1998 and February 2000, the defendant and her husband operated Monarch Aviation Pte. Ltd. ("Monarch"), a Singapore based corporation.  Through Monarch, the defendant exported military aircraft parts from the United States to Singapore without obtaining proper federal licenses, in violation of AECA.  Specifically, the defendant illegally exported vane assemblies and bevel gears which are designed for Chinook military helicopters.  In furtherance of the shipment of these items, the defendant caused U.S. companies to falsely identify these military components in export documents filed with the U.S. government as civilian components that did not require export licenses.  In fact, these components are included on the United States Munitions List because they are specifically manufactured for use on military aircraft.

In addition, through Monarch, the defendant exported aircraft parts from the United States to Singapore, and then arranged for the re-export of these items from Singapore to companies located in Tehran, Iran in contravention of IEEPA.  As part of the charged conspiracy, the defendant falsely listed Monarch in Singapore as the ultimate recipient of the parts on export documents filed with the U.S. government.  Among other aircraft parts, the defendant exported to Iran aircraft shields, bolt shears, "o" rings, switch assemblies, and nuts.

The defendant is also charged with laundering the proceeds of the unauthorized export of military hardware, in violation of 18 U.S.C. § 1956(a)(2)(A).  If convicted, the defendant faces up to ten years imprisonment for each violation of AECA and IEEPA, and up to twenty years imprisonment for money laundering.  See 22 U.S.C. § 2778(c); 50 U.S.C. 1705(c); 18 U.S.C. § 1956(a)(2).

The defendant remained at large and outside the United States until December 23, 2007, when she was arrested at San Francisco International Airport.  According to the defendant's travel itinerary, on December 18, 2007, she flew from Singapore to China, where she spent five days; on December 23, 2007, the defendant flew from China to the United States.

At the time of her arrest, the defendant was in possession of both United States and United Kingdom passports.  The defendant was also in possession of a business card listing her as a "director" of Monarch, with both office and residential

addresses in Singapore.

In addition, an examination of the defendant's luggage revealed two merchandise catalogues from the China National Precision Machinery Import and Export Corporation ("CPMIEC"). (See Catalogues, attached hereto as Exhibits A & B).  The United States Treasury Department has specifically designated CPMIEC as a Weapons of Mass Destruction proliferator.  Due to this designation, all United States persons and entities are strictly prohibited from engaging in business with CPMIEC.

In its catalogues, seized from the defendant's luggage, CPMIEC identifies itself as engaged in "the import and export of defense missile weapons systems, aerospace equipment [and] satellite technology . . ."   CPMIEC further describes itself as "a main channel authorized by the Chinese government for the import and export of hi-tech products and technology . . ."  The products advertised in the catalogues seized from the defendant include surface-to-air missile systems and rocket launchers.

At the time of her arrival in the United States, the defendant told Customs and Border Protection officers that she had not visited the United States in several years.  Despite her possession of the Monarch business card identifying her as a company director, the defendant stated that she was unemployed, and had never been employed.  The defendant also stated that she had received the CPMIEC weapons catalogues from "a friend" in China, but that she could not remember the friend's name.

After her arrest, the defendant was arraigned in the Northern District of California.  After a contested detention hearing, a Magistrate Judge in the Northern District of California ordered the defendant removed in custody to the Eastern District of New York.

II.   Arraignment and Detention Hearing

The defendant was arraigned in the Eastern District of New York on February 1, 2008 before Magistrate Judge Viktor Pohorelsky.  After a lengthy detention hearing during which the defendant made many of the same arguments raised in the instant application, Judge Pohorelsky ordered that the defendant be remanded.  (See Transcript of Arraignment ("Tr."), attached to Defendant's Letter as Exhibit E).  In denying bail, Judge Pohorelsky found that, although the defendant had "some ties" to the United States "early . . . in her adult life, those ties have dissipated rather substantially since she moved to Singapore." (Tr. at 36).  Judge Pohorelsky noted that for "the last 20 years

or so [the defendant's life has been] entirely centered in Singapore or outside the United States . . . "  (Tr. at 37).  In addition, Judge Pohorelsky noted that the defendant has "substantial assets" including a $4.5 million home in Colorado which she has not even visited in four years.  (Id.)  Thus, Judge Pohorelsky noted that it was probable that the defendant had additional substantial assets outside the United States.  (Id.)  Moreover, Judge Pohorelsky was unpersuaded by the argument, also advanced in the instant application, that the defendant was merely a wealthy housewife, uninvolved in Monarch's business.  Judge Pohorelsky noted that he was "inclined to accept the government's" description of the defendant's direct involvement in Monarch's affairs.  (Tr. at 38).  In support of this finding, Judge Pohorelsky noted that the defendant was arrested in possession of a Monarch business card as well as weapons catalogues.  (Tr. 38-41)  Judge Pohorelsky also noted the defendant's "dissembling" explanations to Customs and Border Protection officers at the time of her arrest.  (Tr. 38-41).

III.  Argument

In evaluating a motion for remand pending trial, the Court must consider a number of factors to determine whether there are conditions of release which will reasonably assure the continued appearance of the defendant as well as the safety of the community.  See 18 U.S.C. § 3142(g).  These factors include the nature and circumstances of the offense charged; the weight of the evidence; the defendant's personal circumstances and ties to the community; and the danger to the community that would be posed by the defendant's release.  Id.

The defendant seeks reconsideration of Judge Pohorelsky's detention order based on her assessment that the discovery produced thus far reveals that the proof of her guilt is weak.  Specifically, the defendant claims that, although she was nominally a director of Monarch, she was uninvolved in its day-to-day operations.  Rather, she claims that the company was primarily operated by her estranged husband and co-defendant, Brian Woodford.  Moreover, the defendant asserts that the government will be unable to prove the requisite mens rea required by the applicable statutes, namely that she knew it was illegal to trans-ship U.S. origin aircraft components to Iran.  In addition, the defendant claims that she has substantial ties to the United States.

Each of these arguments is unavailing.  In fact, the government possesses direct proof of the defendant's intimate knowledge of Monarch's operations and her awareness of the

5

illegal nature of Monarch's business. In addition, the defendant concedes that prior to her arrest she had not set foot in the United States in approximately five years.

### A. The Defendant has Strong Ties and Substantial Assets Overseas

The defendant concedes that she has resided outside the United States for the last 30 years. (Def.'s Letter at 1). In addition, the defendant admits that prior to her arrest she had not traveled to the United States since 2002. (Id. at 2). While the defendant claims that she had been "exploring a permanent return to the United States" before she was arrested (Def.'s Letter at 2), an email received by the defendant on December 28, 2006 indicates otherwise. (See Email dated December 28, 2006, attached as Exhibit C hereto).[1] In that email, the defendant received detailed advice regarding applying for permanent resident status in Singapore. (Id.) Singapore, like many other foreign nations, will not extradite individuals for export violations like those charged here.[2]

Moreover, Monarch was in the lucrative import/export business in Singapore for over fifteen years, and during that period is known to have exported goods worth millions of dollars. In addition, Monarch is known to have maintained several bank accounts overseas. In the defendant's interview with the pretrial services department, the defendant admitted that she had a home in Singapore worth several million dollars. (Tr. at 33-34). In addition, the defendant has a home in Colorado worth over four million dollars, which is currently on the market. (Id. at 21-22). The value of these properties alone exceeds the amount of the bond that the defendant is willing to post. Indeed, the true extent and location of the defendant's assets abroad is unknown. The likely existence of significant assets abroad strongly counsels against reconsideration of Judge Pohorelsky's detention order.

---

[1]  A search warrant executed after the defendant's arrest on an email account registered to her has yielded thousands of emails and other documents sent and received by the defendant.

[2] Although the defendant indicates that she is willing to sign a waiver of extradition, it is uncertain what effect, if any, such a waiver would have if the defendant were to flee to a country that does not honor extradition requests for these type of offenses.

       B.    The Government's Proof of the Defendant's Direct Participation in Monarch's Affairs and her <u>Knowledge of Illegality is Overwhelming</u>

       The defendant claims that she was primarily a housewife with little or no involvement in Monarch's business. In addition, the defendant asserts that she did not understand United States trade restrictions with Iran nor the licensing requirements governing the export of military goods, and that the government will be unable to prove otherwise. The defendant also asserts that the charges in the indictment are stale and that the discovery produced thus far demonstrates no direct by the defendant in Monarch's operations. These assertions regarding the government's proof are incorrect. In fact, the government will prove through both witness testimony and documentary evidence that the defendant played an integral role in Monarch's affairs; the defendant knew Monarch violated United States export control laws; and the defendant remained actively engaged in illegal trade with Iran only weeks before her arrest.

       At trial, witnesses for the government, including a former Monarch employee and a U.S. based supplier of aircraft parts to Monarch, will testify that the defendant was directly and actively engaged in the operation of Monarch's business. The defendant solicited business for Monarch, supervised Monarch employees, and at times oversaw Monarch's finances. Indeed, for certain periods the defendant ran Monarch herself without the assistance of her husband. In addition, the defendant personally traveled to Iran and met with Iranian officials to discuss Monarch's business.

       The government's witnesses will also testify that the defendant was personally aware that Monarch's dealings with Iran violated United States law. The defendant repeatedly instructed her employees to exercise caution due to the illegal nature of Monarch's business. In fact, the defendant told her employees to use code words rather than explicitly referring to "Iran" when speaking about Monarch's customers. Indeed, the defendant was aware that Monarch was able to charge a significant premium, above the usual markup for aircraft parts, because it was engaged in the illegal shipment of goods to Iran.

       The defendant's integral role in Monarch's operations will also be proved through documentary evidence. For example, in a document recovered from the defendant's email account which appears to be a draft letter from the defendant to her estranged husband regarding the division of marital assets, the defendant writes "[y]ou must not forget that I played a not insignificant

role in building up our business ever since Monarch commenced."[3]

In addition, numerous emails recovered demonstrate that the defendant remained engaged in illegal trade with Iran until shortly before her arrest. In an email sent to the defendant on June 19, 2007 titled "Turkey," an associate of the defendant's wrote her regarding a business proposal involving the construction of a power plant in a country that the associate referred to as "Turkey." (See Email dated June 19, 2007, attached hereto as Exhibit E). Notably, the word "Turkey" appears in quotation marks in both the subject line and the body of the email. (See id.) The sender also notes his Swiss associates are unwilling to deal directly with "Turkey" for political reasons. (Id.) "Turkey" is a code word that the defendant is known to have used when referring to Iran. Indeed, in a subsequent email from the same associate, that associate drops the code, explicitly referencing the use of new power generation technology in Iran. (See Email dated September 11, 2007, attached hereto as Exhibit F). This subterfuge is direct evidence of the defendant's awareness of the illegality of her conduct.

Additional emails received by the defendant only weeks before her arrest demonstrate that she was personally engaged in illegal trade with Iran. In fact, these emails demonstrate that the defendant received weekly reports regarding the business operations of a company known as "Jungda," a successor to Monarch. In emails dated October 26, 2007 and December 14, 2007, a Jungda employee known as "Yip" sent the defendant detailed status reports regarding Jungda's sales of aviation components to Iran. (See Emails dated October 26, 2007 and December 14, 2007, attached hereto as Exhibits G & H).[4] The emails specifically reference shipments from U.S. suppliers and list purchase orders from Iranian entities, including the Iran Helicopter Support Repair Center (referred to in the emails as "IHSRC"). (Id.) In one email, the employee requests permission from the defendant to

---

[3] A copy of this letter, labeled "Exhibit D," has been provided to defense counsel along with this submission. However, because of the personal nature of the contents of the letter, a copy has not been filed with the Court. If the Court requests, the government will submit a copy of the letter under seal.

[4] These emails and others recovered involving "Jungda" indicate that Jungda has conducted sales to Iran worth millions of dollars, further demonstrating that the defendant has access to substantial funds overseas.

8

take a vacation, thus demonstrating the defendant's hands-on involvement with the company. (See Ex. G). At the detention hearing, defense counsel stated that this same employee, "Yip," had personally informed him that he had been a Monarch employee for a number of years but claimed that the defendant was not involved in Monarch's day to day operations. (Tr. at 12).

The defendant ascribes great significance to the fact that an eight page portion of one of the weapons catalogues seized from the defendant at the time of her arrest was not produced to the defendant until after the initial detention hearing. However, viewed in their entirety the complete catalogues do little to support the defendant's assertion that she possessed them for an innocuous purpose. Indeed, one catalogue is devoted entirely to sophisticated weapons systems, including missiles and rocket launchers. (See Ex. A). Moreover, the Chinese company described in the catalogues, CPMIEC, has been designated by the Treasury Department as a Weapons of Mass Destruction proliferator, and therefore all U.S. persons are prohibited from doing business with that entity. Indeed, the very Dun & Bradstreet report cited by the defendant states that CPMIEC "is mainly engaged in importing and exporting arms [and] military tools, electric and precision machine[s]." (Def.'s Letter, Ex. D at 7). As Judge Pohorelsky concluded, the defendant's possession of these catalogues belies her claim that she is merely an unsophisticated homemaker. Rather, when coupled with the recent emails discussing the construction of an energy plan in Iran, the catalogues demonstrate the defendant's extensive business ties to countries and entities that have been embargoed by the United States government.

### III. Conclusion

Contrary, to the defendant's assertions, the government's proof of guilt is exceedingly strong. The defendant faces a sentence of sufficient duration that she could spend the rest of her life in prison. Given her extensive ties abroad, her substantial foreign assets, and her demonstrated ability to evade customs and export laws, the risk of flight is severe. Therefore, the government respectfully requests that the Court deny the defendant's application to revoke the permanent order of detention entered by Magistrate Judge Pohorelsky on February 1, 2008.

    Respectfully submitted,

    BENTON J. CAMPBELL
    United States Attorney

By:        /s/
    Daniel S. Silver
    Cristina M. Posa
    Assistant U.S. Attorneys
    (718) 254-6034/6668

Enclosures

cc:  Matthew Levine, Esq. (By Email & ECF)