

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

F.#2003R00092　　　　　　　　　　　　　*271 Cadman Plaza East*
JAJ:DSS　　　　　　　　　　　　　　　　*Brooklyn, New York  11201*

June 22, 2009

By Hand and ECF

The Honorable Sterling Johnson, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

　　　　　Re:　United States v. Laura Wang-Woodford
　　　　　　　　Criminal Docket No. 03-070 (S-1)(SJ)

Dear Judge Johnson:

　　　　The defendant in the above-captioned matter is scheduled to be sentenced on June 25, 2009 at 9:30 a.m.  On March 13, 2009, the defendant pled guilty to conspiring to violate the International Emergency Economic Powers Act ("IEEPA")[1] by exporting aircraft components from the United States to Iran, in violation of 18 U.S.C. § 371.  The applicable Guidelines range for this offense is 37 to 46 months imprisonment.  For the reasons set forth below, a sentence at the upper end of this range, as well as the imposition of a substantial fine, is appropriate.

　　　　I.　Statutory and Regulatory Framework

　　　　IEEPA gives the President of the United States broad authority to regulate exports and other international transactions in times of national emergency.  See 50 U.S.C. § 1702(a)(1).  IEEPA controls are triggered by an executive order declaring a national emergency based on an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 § 1701.  Executive orders issued under IEEPA may impose a broad trade embargo against a particular country that is more comprehensive than standard export controls, in that the embargo

---

　　　[1]　IEEPA is codified at 50 U.S.C. §§ 1701-1706.

bars U.S. persons from engaging in a broad range of transactions involving a particular foreign government or its nationals, unless specific government authorization is obtained in advance.

On March 15, 1995, President Clinton issued Executive Order 12959, which continued previously-issued executive orders in declaring a national emergency with respect to the Islamic Republic of Iran ("Iran").  The executive order was issued based on presidential findings that the policies and actions of the Government of Iran constitute a threat to the national security of the United States due to Iran's support of international terrorism and its attempts to acquire weapons of mass destruction.

On May 6, 1995, under executive IEEPA authority, the President declared a trade embargo against Iran, prohibiting the export from the United States to Iran of any goods, technology or services, with limited exceptions for publications, other informational material, and donated articles such as medical supplies intended to relieve human suffering.  On August 17, 1997, the President reiterated and renewed the Iranian Embargo by issuing Executive Order 13059, which remained in effect during the period of the instant offense.

In September 1995, the United States Treasury Department, Office of Foreign Assets Control ("OFAC") issued regulations implementing the executive orders and trade embargo (the "Iranian Transactions Regulations" or "ITR").  See 31 C.F.R. § 560 et seq.  These regulations prohibit the export of goods from the United States to Iran without obtaining a license from the Treasury Department.  The ITR further prohibited any transaction evading or avoiding the Iranian Embargo, including the export of goods from the United States to a third country, if the goods are intended or destined for Iran.

II.   Factual Background

Beginning in the late 1980s and continuing until approximately 2007, the defendant and her husband, Brian Woodford, owned and operated Monarch Aviation Pte Ltd. ("Monarch"), a Singapore-based corporation.  Brian Woodford, a British citizen, was chairman and managing director of Monarch and the defendant was a director of the company. (Presentence Investigation Report ("PSR") ¶ 12).  Throughout its existence, Monarch exported civilian and military aircraft components from various U.S. manufacturers and suppliers to Singapore and Malaysia, and then re-exported those goods to Iranian companies located in Tehran, Iran.  (Id.)  Initially, the goods were sent

from the United States to Monarch in Singapore and then transhipped to Iran.  Later, Monarch shipped the goods from the United States to a subsidiary in Malasyia and then re-exported the goods to Iran.  (PSR ¶ 16).  In order to evade U.S. export controls, the defendant and her associates at Monarch misrepresented the ultimate recipients of the goods to U.S. suppliers, the United States Commerce Department and the United States Customs Service.  (PSR ¶ 12).  The goods exported included components for military helicopters, as well as commercial aircraft parts.  (PSR ¶¶ 10 n.2, 12, 17).[2]

      For most of the time period encompassed by the indictment, Brian Woodford exercised primary responsibility for the operations of Monarch while the defendant shared in the substantial profits.  (See PSR ¶ 56 (Defendant stated that she "never earned a salary . . . but that she was granted access to the business accounts.").  However, in 1997 Brian Woodford had an affair and left both his marriage and Monarch for approximately six months.  (PSR ¶¶ 13, 15).  During this period, the defendant assumed primary responsibility for operating Monarch.  (PSR ¶ 13).  During this period, all of Monarch's business was with Iranian customers.  (PSR ¶ 14).

      In 2007, the defendant became estranged from her husband and began a successor corporation, Jungda International Pte Ltd. ("Jungda") with a former employee from Monarch.  (PSR ¶¶ 18, 25).  Emails recovered pursuant to a search warrant after the defendant's arrest demonstrate that, in late 2007, Jungda sold several million dollars worth of United States-origin aircraft components to Iranian entities.  (PSR ¶¶ 18, 25).  Additional emails revealed that, several months prior to her arrest, the defendant was involved in negotiations to build a power plant in Iran.  (PSR ¶ 23).

      On December 23, 2007, the defendant was arrested at San Francisco International Airport after arriving on a flight from China.  (PSR ¶ 19).  At the time of her arrest, the defendant was in possession of two merchandise catalogues from the China National Precision Machinery Import and Export Corporation ("CPMIEC").  (PSR ¶ 20).  The catalogues advertised a variety of goods and services, including surface to air missiles and rocket launchers.  (Id. n.5).

---

[2] The military goods included "bevel gears" and "vane assemblies" for use on Chinook military helicopters.  The commercial parts included seals, bolts, "o" rings and other goods.

4

### III. Applicable Guidelines Calculation

The Probation Department recommends a base offense level of 26. (PSR ¶ 31; U.S.S.G. § 2M5.1(a)(1)). This offense level is consistent with the stipulated base offense level contained within the defendant's plea agreement. In addition, the government concurs with the Probation Department that the defendant should receive a three level reduction for acceptance of responsibility. (PSR ¶ 37; U.S.S.G. § 3E1.1).

However, the government disagrees with the Probation Department regarding the defendant's role in the offense. The Probation Department recommends a three level enhancement because the defendant, at times, exercised a supervisory role over other Monarch employees. (PSR ¶¶ 27, 34; U.S.S.G. § 3B1.1(b)). The government maintains that, relative to her husband, the defendant played a minor role in the offense and that therefore a two level minor role reduction is warranted. See U.S.S.G. § 3B1.2(b).

The application notes to the relevant Guidelines provisions state that, in contemplating an aggravating role enhancement, the Court should consider "the exercise of decision-making authority, the nature of participation in the commission of the offense . . . [and] the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 (cmt., n.4). Conversely, a minor role reduction is appropriate where a defendant's role renders her "less culpable than most other participants." U.S.S.G. § 3B1.2 (cmt., n. 5).

Here, based on a review of the defendant's conduct over the entire time period of the charged conspiracy, the government submits that she is less culpable than a typical offender and is therefore entitled to a two-level minor role reduction. While the defendant played a supervisory role at Monarch for several months in 1997, for the majority of the offense the defendant had little direct involvement in Monarch's operations. Rather, the defendant managed her and her husbands social affairs and helped maintain certain business relationships. For a brief period in 2007 the defendant attempted to start a successor corporation to Monarch, but was arrested soon after this corporation began operations. Thus, the government maintains that the overall adjusted offense level should be 21. Since the defendant is in criminal history category I, this yields a range of imprisonment of 37 to 46 months.

IV.  The Appropriate Sentence

In <u>United States v. Kimbrough</u>, 128 S. Ct. 528 (2007), the Supreme Court reiterated that, "[w]hile rendering the Sentencing Guidelines advisory, <u>United States v. Booker</u>, 543 U.S. 220, 245 (2005), we nevertheless preserved a key role for the Sentencing Commission . . . . [D]istrict courts must treat the Guidelines as 'the starting point and the initial benchmark,' <u>Gall v. United States</u>, 128 S. Ct. 586, 596 (2007)   . . . [and] the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" <u>Kimbrough</u>, 128 S. Ct. at 574 (quoting <u>Rita v. United States</u>, 127 S. Ct. 2456, 2465 (2007)).  Indeed, "Congress established the Commission to formulate and constantly refine national sentencing standards." <u>Kimbrough</u>, 128 S. Ct. at 574 (citation omitted).

Thus, "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)," <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005), and judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." <u>Id</u>. At 113.

Here, the government maintains that a sentence at the upper end of the applicable Guidelines range of 37 to 46 months is appropriate.  Several factors weigh in favor of a sentence at the high end of this range.  First, the offense spanned a lengthy period of time.  The defendant, through Monarch, evaded the Iranian trade embargo beginning in the 1990s and continuing until her arrest in 2007.  Second, the defendant went to considerable lengths to conceal her activities.  In addition to misrepresenting the ultimate origin of the goods to U.S. exporters, the defendant and other Monarch employees used code words when referring to customers in Iran.  (PSR ¶¶ 14, 23). Third, when Monarch's operations declined in 2007, the defendant attempted to continue Monarch's business through Jungda, a successor corporation.  Based on the weapons catalogue found in her possession at the time of her arrest, it appears that the defendant was exploring business opportunities with this Chinese weapons manufacturer as well.

Finally, the defendant and her husband earned enormous profits as a result of their offense.  At times, Monarch imposed

50% to 100% markups on the goods it exported to Iran.  As a result of their crimes, the defendant and her husband lived a luxurious lifestyle.  The defendant owns expensive properties in Texas, Colorado and Singapore.  (PSR ¶ 58).[3]  The defendant also has several antique airplanes registered in her name.  (PSR ¶ 63).  Indeed, the Probation Department estimates the defendant's net worth at almost $5.5 million.  (PSR ¶ 60).

The defendant has agreed to forfeit $500,000 in connection with her conviction.  However, the Court may also impose a fine of up to $250,000.  The government maintains that a substantial fine is appropriate in this case.

V.   Conclusion

For the reasons set forth above, the government maintains that the Court should impose sentence at the upper end of the applicable Guidelines range of 37 to 46 months imprisonment and impose a substantial fine.

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney

By:   /s/ Daniel S. Silver
Daniel S. Silver
Assistant U.S. Attorney
(718) 254-6034


cc:  Clerk of the Court (SJ) (By ECF)
     Anthony Lombardino, Esq. (By Facsimile & ECF)
     Probation Officer Victoria Aguilar(By Email)

---

[3]  Brian Woodford also owns a large estate in Dorset, England.